JOHN O. MELBY & COMPANY BANK, Plaintiff-Respondent, v. ANDERSON, and wife, Defendants-Appellants: STATE BANK OF INDEPENDENCE, Garnishee-Respondent.

Supreme Court

No. 76–426. Submitted on briefs January 31, 1979.— Decided March 27, 1979.
(Also reported in 276 N.W.2d 274.)

For the appellants the cause was submitted on the brief of *Stephen F. Andersen* and *Hegge & Andersen* of Whitehall.

For the respondent the cause was submitted on the brief of *Mattka, Robertson & Berns* of Whitehall.

HEFFERNAN, J. The only question presented on this appeal is whether the garnishment restrictions of Title III of the federal Consumer Credit Protection Act, 15 U.S.C. secs. 1671–1677, apply to wages deposited in a checking account. We conclude that the federal statutory restrictions on garnishment do not apply to wages after payment to an employee and deposit in a bank account. Accordingly, we affirm the judgment and order of the county court.

The record shows that the John O. Melby & Co. Bank was a judgment creditor of the defendant Marilyn Anderson in the amount of $20,000. Because Marilyn An-

derson and her husband, LeRoy Anderson, had funds on deposit in their checking account with the State Bank of Independence, John O. Melby & Co. Bank served the depository, State Bank of Independence, with a garnishee summons and complaint.

The principal defendants, the Andersons, answered the complaint, alleging that the property in the possession of the garnishee bank consisted solely of wages and that 75 percent of those wages were protected from garnishment by the statutes of the United States and the statutes of the State of Wisconsin.[1]

The garnishee defendant, State Bank of Independence, answered, stating that it held $469 in a joint checking account of the defendants and that it held that sum subject to further order of the court. It disclaimed any knowledge of the appropriate exemptions.

Following the exchange of pleadings, LeRoy and Marilyn Anderson filed affidavits stating that the funds in the joint checking account came solely from LeRoy Anderson's wages. He stated that his weekly take-home pay was $230.55; that on August 30, 1976, he deposited his payroll check in that amount into the joint account; and that the garnishment of the account deprived him of the total amount of that weekly pay check. These facts were not disputed.

Both plaintiff and defendants moved for summary judgment, and summary judgment was granted to the

---

[1] Although the defendants initially answered claiming an exemption under the state statutes, this defense has not been pursued; and the action proceeded solely on the protection afforded by the United States Code. The analogous statutes of the State of Wisconsin are contained in ch. 812, Stats. The application of those statutes to the instant facts is not raised on this appeal, apparently because the Andersons have concluded that the Wisconsin provisions apply only to earnings in the possession of the employer. We do not in this opinion attempt to consider the application of the state garnishment restrictions to bank deposits traceable to earnings.

plaintiff on the ground that the federal Consumer Credit Protection Act did not impose a restriction on the garnishment of funds deposited in a bank account, even though those funds were wholly traceable to payroll earnings. Accordingly, judgment was entered for the plaintiff in the sum of $469, and an order was issued by the court directing the garnisheee to pay over the entire amount in the account to the plaintiff creditor.

Because the facts are not in dispute, this case was ripe for disposition on summary judgment. The question is wholly one of law and must be resolved by the language of the federal statutes.

The federal statutes pertinent to this case provide:

"SUBCHAPTER II—RESTRICTIONS ON GARNISHMENT [15 U.S.C.]

"Sec. 1671. Congressional findings and declaration of purpose.

"(a) The Congress finds:

"(1) The unrestricted garnishment of compensation due for personal services encourages the making of predatory extensions of credit. Such extensions of credit divert money into excessive credit payments and thereby hinder the production and flow of goods in interstate commerce.

"(2) The application of garnishment as a creditors' remedy frequently results in loss of employment by the debtor, and the resulting disruption of employment, production, and consumption constitutes a substantial burden on interstate commerce.

"(3) The great disparities among the laws of the several States relating to garnishment have, in effect, destroyed the uniformity of the bankruptcy laws and frustrated the purposes thereof in many areas of the country.

" . . . .

"Sec. 1672. Definitions.

"For the purposes of this subchapter [15 U.S.C. secs. 1671–1677]:

"(a) The term 'earnings' means compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and in-

cludes periodic payments pursuant to a pension or retirement program.

"(b)  The term 'disposable earnings' means that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by law to be withheld.

"(c)  The term 'garnishment' means any legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt.

"Sec. 1673.  Restriction on garnishment.

"(a)  Maximum allowable garnishment.

"Except as provided in subsection (b) of this section and in section 1675 of this title, the maximum part of the aggregate disposable earnings of an individual for any workweek which is subject to garnishment may not exceed

"(1)  25 per centum of his disposable earnings for that week, or

"(2)  the amount by which his disposable earnings for that week exceed thirty times the Federal minimum hourly wage prescribed by section 206(a)(1) of Title 29 in effect at the time the earnings are payable,

whichever is less. In the case of earnings for any pay period other than a week, the Secretary of Labor shall by regulation prescribe a multiple of the Federal minimum hourly wage equivalent in effect to that set forth in paragraph (2).

"·  ·  ·  ·"

It is apparent from the face of these statutes that, arguably at least, an ambiguity exists. Sec. 1672 defines earnings as compensation "paid or payable for personal services." From this the defendants argue that it was the intent of Congress to restrict garnishment of funds traceable to earnings, even after the earnings were "paid" by the employer to the employee.

Despite this arguable ambiguity, which lends some plausibility to the defendants' claim, the statutes themselves and the legislative history of Title III of the federal Consumer Credit Protection Act demonstrate that

it was not the intent of the Congress to protect from garnishment funds paid out as earnings after they went into the possession of an employee. The findings of the Congress in 15 U.S.C. sec. 1671(a)(1), (2), and (3) convincingly evidence that the intent was to protect the employment relationship. The findings state that garnishment resulted in the loss of employment by the debtor, disrupted production, constituted a burden on interstate commerce, and encouraged predatory extensions of credit. The findings also state that the disparities of the state laws relating to garnishment destroyed the uniformity of the bankruptcy laws throughout the country.

The legislative history amplifies the concerns set forth in these findings. Portions of this legislative history are to be found in 2 U. S. Code Congressional and Administrative News (1968), pp. 1962–63, 1977–79 (H. Rep. No. 1040, 90th Cong., 2d Sess.; 114 Cong. Record 1831–41, House Debate February 1, 1968). The legislative history of Title III is also discussed in Moran, *Relief for the Wage Earner: Regulation of Garnishment under Title III of the Consumer Credit Protection Act,* 12 B. C. Industrial and Commercial Law Rev. 101 (1970); Note, 12 William and Mary Law Rev. 357 (1970).

This legislative history demonstrates that the Congress saw wage garnishment as a source of a number of social problems. Particularly, the Congress was concerned with an alarming increase in personal bankruptcies. The legislative history reveals that the ordinary wage earner had no choice but to go into bankruptcy after the garnishment of his wages deprived him of means of support for himself and his family. The legislative history demonstrated that debtors were often fired after the garnishment of their wages, because employers were unwilling to accept the burden of administering the expense of garnishment. In addition, wage garnishment, because it made debts easily collectible by a creditor, was

considered a stimulus to the unworthy extension of credit.

It was to alleviate these problems, demonstrated in the findings of the Congress and in the debates, that the statute (sec. 1673) limited the portion of earnings subject to garnishment, prohibited employers from discharging employees because their earnings had been garnisheed for any one indebtedness (sec. 1673), and, in addition, provided that states could impose more rigorous restrictions on garnishment (sec. 1677).

*Kokoszka v. Belford*, 417 U.S. 642, 651 (1974), summarized the legislative history by stating:

"There is every indication that Congress, in an effort to avoid the necessity of bankruptcy, sought to regulate garnishment in its usual sense as a levy on periodic payments of compensation needed to support the wage earner and his family on a week-to-week, month-to-month basis."

The legislative history of Title III of the Consumer Credit Protection Act was also analyzed in *Dunlop v. First National Bank of Arizona*, 399 F. Supp. 855 (D. Ariz. 1975). The question presented in *Dunlop* is essentially the same as that in the instant case. The garnishee bank in that case had been served with writs of garnishment for the purpose of attaching funds held for depositors. The court concluded that tthe Consumer Credit Protection Act restricting wage garnishment did not apply to funds deposited in a financial institution. It stated that, "The statute is concerned with the regulation of the garnishment process itself and not the protection of a given fund." 399 F. Supp. at 857. It looked to the legislative history of the Act and concluded that the purpose of the restrictions on garnishment was to govern the relationship between employers and employees and was aimed at "the evils that befall that relationship when wages are garnished." The court in *Dunlop* pointed out

that, although other portions of the Consumer Credit Protection Act address themselves to responsibilities of financial institutions, Title III, which restricts garnishment, makes no reference to financial institutions or funds on deposit therein. *Dunlop* pointed out that, had it been the intent of Congress to extend the reach of the restrictions to funds derived from wages after they were deposited with a financial institution, it would specifically have done so.

We find the reasoning of *Dunlop* persuasive. In addition, the conclusion that Title III is to be applied only to wage garnishments affecting the employer-employee relationship is almost expressly, and certainly implicitly, required by the language of Title III. The restriction on garnishment, sec. 1673 (a), refers to "disposable earnings of an individual for any workweek." The percentage of disposable earnings subject to garnishment is to be computed on the basis of weekly and hourly earnings or, if wages are not paid weekly, on the basis of a "pay period." The fact that the percentage subject to garnishment is figured on a weekly basis or other pay period implies that Congress contemplated that the restrictions of the statute apply only to garnishment from the employer.

The term, "earnings," defined in sec. 1672(a), specifically refers to compensation for personal services. "Disposable earnings," defined in sec. 1672(b), means the earnings remaining after the deduction from earnings of the amounts required by law to be withheld.

It could not be clearer that the Congress was concerned with the protection of earnings in the ordinary payroll process. There is nothing to suggest that the restrictions on garnishment were intended to apply to wages after they had been paid over to the worker.

Although we see nothing in the language of the Act or in its legislative history which evidences a congressional intent to extend protection from garnishment

to earnings after receipt by the employee, the Wage Hour Administrator of the Department of Labor has interpreted the "paid or payable" language of sec. 1672(a) as protecting earnings on deposit in a bank "so long as they are capable of identification as such." Opinion Letter No. 1223, August 3, 1972, C.C.H. Lab. L. Rep. para. 30,805, p. 42,257 (Transfer Binder 1969–1973).

That interpretation was rejected in *Dunlop, supra*. The district court recognized that, while deference should be paid to administrative interpretations, the ultimate interpretation of a statute rests with the court. *Dunlop,* on the basis of the rationale set forth above, concluded that the administrative construction given the statute was contrary to its language and was not supportable.

It is apparent also, from the opinion of the United States Supreme Court in *Kokoszka v. Belford, supra,* that it is incorrect to conclude that the statute protects earnings so long as they are capable of identification. In *Kokoszka,* the claim was made that the Consumer Credit Protection Act extended to a tax refund which would otherwise be subject to the claims of the trustee in bankruptcy. The taxpayer's argument was that, since the tax refund was without dispute traceable and identifiable as a portion of the taxpayer's prior earnings, the refund was "disposable earnings" within the meaning of sec. 1672. The Supreme Court quoted with approval the statement of the Court of Appeals in its disposition of the same case that "disposable earnings" as used in secs. 1672 and 1673 did not include a tax refund but were limited to "periodic payments of compensation and [do] not pertain to every asset that is traceable in some way to such compensation." 417 U.S. at 651.

While it is clear that an income-tax refund is derived from earnings, it is equally clear that it is not earnings in the sense of payroll earnings, which would be

available to wage earners on pay day in the absence of a garnishment proceeding.

It is also clear that bank accounts, although resulting from a deposit of the employee's payroll check, are not "disposable earnings" sought to be protected by the Act, which assures that the flow of no more than 25 percent of the "disposable earnings" can be kept from an employee from wages due him from the employer.

The question remains, however: What was the congressional intent when it defined earnings as compensation "paid," as well as compensation "payable"? That language gives some credence to the defendants' argument that, even after wages are paid, they are afforded protection. It is apparent, as set forth above, however, that the history and the general language of the statute do not support their contention.

At least one court has concluded that compensation "paid" comports with the general tenor of the statute, applying it only to the process of garnishment between the employer and the employee, but concluding that compensation "paid" should be considered in an accounting sense. The United States District Court in *Hodgson v. Christopher*, 365 F. Supp. 583 (1973), considered the question where there was an attempt to attach a judgment debtor's pay check while that check was still in the possession of the employer. That court held the restrictions of the Consumer Credit Protection Act to be applicable to a garnishment or attachment of the check in the employer's hands, because compensation paid—in the sense that a check had already been drawn —nevertheless constituted earnings under the Consumer Credit Protection Act. *See, also,* Note, 9 Creighton Law Rev. 761, 767 (1975).

Defendants additionally rely on other cases using the "paid or payable" language in which courts have construed the protection of other federal statutes to extend to the particular fund even after it had been received

and deposited by the recipient. *Philpott v. Essex County Welfare Board,* 409 U.S. 413 (1973) (in reference to social security benefits) ; *Lawrence v. Shaw,* 300 U.S. 245 (1937) (in reference to veterans' benefits). We conclude that these statutes and cases are inapplicable to the interpretation of the "paid or payable" language of the Consumer Credit Protection Act. Both cases interpreted statutes whose language and legislative history demonstrated that the benefits were not to be subject to the claim of creditors. There was no evidence from the language of the statutes or from the legislative history that the restrictions upon creditors were to be limited to the process of making payment to the original recipient. It is apparent that the benefits protected in *Philpott* and *Lawrence* were to be given broader protection than that afforded earnings in the garnishment proceedings under the federal Consumer Credit Protection Act.

It is, of course, true that a state, under the provisions of the federal Consumer Credit Protection Act, may afford greater protection and more stringent restrictions on garnishment than that afforded by the federal law. Sec. 1677 specifically leaves to the states the authority for "prohibiting garnishments or providing for more limited garnishments . . . ."

An example of a more stringent state restriction is found in Alaska. In *Miller v. Monrean* (Alaska), 507 P.2d 771, n. 4 at 773 (1973), the Alaska Supreme Court points out, "Alaska's income exemption statute has a broader application as to income after the debtor has received it . . . ." The Alaska statute is analogous to the federal statutes relied upon by the courts in *Philpott* and *Lawrence,* relied upon by the *defendants.* Such broad protection is not, however, afforded by the Consumer Credit Protection Act, relied upon herein. The Consumer Credit Protection Act protects "disposable earn-

ings" by restrictions on garnishment only prior to the time that they are paid over to the wage earner. Even where, as in this case, money in a checking account is undisputably and directly traceable to payroll earnings, the restrictions of the Act do not apply.

The Wisconsin legislature could, if it considered it to be good public policy, enact legislation placing additional restrictions upon garnishment. The defendants herein have specifically elected to assert their exemption only upon federal law, and we do not herein consider the restrictions upon garnishment afforded by ch. 812 of the Wisconsin Statutes.

*By the Court.*—Judgment and order affirmed.